UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:18-CV-00057-GNS-HBB

WENDY BROWNING, mother and
next friend of C.S., a minor; and
DARRELL SMITH, as guardian of
M.S., a minor                                                           PLAINTIFFS

v.

EDMONSON COUNTY, KENTUCKY;
SHANE DOYLE;
JORDAN JONES; and
AUSTIN MEREDITH                                                         DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motions for Summary Judgment (DNs 57, 58, 59), the parties' Motions for Leave to Exceed Page Limitations (DNs 54, 55, 65, 78), and Defendants' Motion to Exclude Plaintiffs' Expert Witness (DN 56). The motions are ripe for adjudication. For the reasons that follow: (1) the Motions for Leave to Exceed Page Limitations are **GRANTED**; (2) Defendants' Motions for Summary Judgment (DNs 57, 58, 59) are **GRANTED IN PART** and **DENIED IN PART**; and (3) Defendants' Motion to Exclude Plaintiffs' Expert Witness (DN 56) is **DENIED**.

## I.      BACKGROUND

At approximately 9:30 p.m. on February 27, 2018, Defendant Austin Meredith ("Meredith"), an Edmonson County Special Deputy Sheriff, attempted to initiate a traffic stop on an automobile due to an unilluminated license plate and failure to wear seatbelts. (Meredith Dep. 9:20-25, 16:6-23, Oct. 28, 2019, DN 68-4; Jones & Meredith Mem. Supp. Mot. Summ. J. 1, DN 58-1; C.S. Dep. 26:17-25, Oct. 14, 2019, DN 75-1; M.S. Dep. 43:3-19, Nov. 6, 2019, DN 75-2).

1

Plaintiffs C.S. and M.S., who were minors, were passengers in the vehicle driven by Brandon Embry ("Embry"). When Meredith turned on his police cruiser lights, the automobile immediately accelerated. (Meredith Dep. 18:24-19:6). Meredith pursued the automobile and was joined in pursuit by Defendant Jordan Jones ("Jones"), an Edmonson County Deputy Sheriff. (Meredith Dep. 22:16-25). The 12-minute chaser covering 18 miles and reaching speeds of around 120 miles per hour ended when the automobile collided with a third party's vehicle. (Jones & Meredith Mem. Supp. Mot. Summ. J. 3; Jones Dep. 21:21-22:6, 44:2-7, Nov. 4, 2019, DN 68-3; Meredith Dep. 12:13-23).

After the collision, Jones exited his vehicle, pulled his gun out, pointed the gun at Embry, and ordered him to get out. (Jones Dep. 45:6-46:11). As Embry exited the vehicle, Jones punched him in the forehead, apparently to stop him from fleeing. (Jones Dep. 47:3-13). Jones then turned his attention to C.S. and ordered C.S. to show his hands multiple times without receiving a response. (Jones Dep. 51:21-52:3, 52:14-17). According to Jones, he then tased C.S. because of information Jones received about ammunition being in the car and C.S. not showing his hands after multiple orders to do so. (Jones Dep. 53:23-54:3). C.S. does not remember anything after the crash because he believes he lost consciousness and did not regain consciousness until he was lying face down on the ground handcuffed. (C.S. Dep. 32:23-34:2).

M.S. had to be mechanically extracted from the automobile. (Jones Dep. 55:10-14). C.S. and M.S. were flown by helicopter to a hospital to receive treatment for their injuries. (C.S. Dep. 35:5-38:4; Pls.' Resp. Defs.' Mots. Summ. J. Ex. 12, at 2, DN 66-12).

Plaintiffs allege liability on the part of Defendants for M.S. and C.S.'s injuries. (Second Am. Compl. ¶ 3, DN 6). Specifically, Plaintiffs assert 42 U.S.C. § 1983 claims for violations of the Fourth and Fourteenth Amendments against all Defendants, state law negligence and gross

negligence claims against all Defendants, and assault and battery claims against Meredith and Jones.  (Second Am. Compl. ¶¶ 16-20).  All Defendants have moved for summary judgment on Plaintiffs' claims, and both sides have moved to exceed the page limits on their supporting memoranda.  (Jones & Meredith Mot. Summ. J. 1, DN 58; Doyle Mot. Summ. J. 1, DN 57; Jones & Meredith Mot. Exceed Page Limit 1, DN 54; Jones Mot. Exceed Page Limit 1, DN 55; Edmonson Cty. Mot. Summ. J. 1, DN 59; Pls.' Mot. Exceed Page Limit 1, DN 65; Defs.' Mot. Exceed Page Limit Reply 1, DN 78).  Defendants have also moved to preclude Plaintiffs' expert witness from testifying at trial in lieu of the potential denial of their summary judgment motions.  (Defs.' Mot. Exclude Expert Witness 1, DN 56).

## II.      JURISDICTION

The Court possesses federal question jurisdiction over Plaintiffs' federal law claims and supplemental jurisdiction over Plaintiffs' state law claims.  *See* 28 U.S.C. §§ 1331, 1367(a).

## III.      STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV.     DISCUSSION

Generally, when both federal and state law claims are before a federal court, a federal court is to apply federal law to the plaintiff's federal law claims and state substantive law to the state law claims.  *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 737, 741 (6th Cir. 1999) (citations omitted).  Kentucky substantive law applies to Plaintiffs' state law claims. *Id.* at 741 ("A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." (citation omitted)).

### A.     Motions to Exceed Page Limits

As an initial matter, regarding the parties' motions to exceed the page limit on their supporting memoranda, the only opposition to any of these motions is Plaintiffs' challenge to Defendants' collective motion to exceed the page limit on Defendants' reply to Plaintiffs' response to Defendants' summary judgment motions.  (Pls.' Resp. Defs.' Mot. Exceed Page Limit Reply 1-3, DN 81).  Defendants' combined reply is 37 pages.  (Defs.' Reply Mots. Summ. J. 1-37, DN 60). Local Rule 7.1(d) provides that a reply is not to exceed 15 pages.  That being said, Defendants filed three separate motions (without objection from Plaintiffs), which would technically allow Defendants three replies of 15 pages each, for a total of 45 pages.  As Defendants' combined reply

4

is eight pages less than what would be allotted to them in total, and because the parties do not otherwise object to each other's motions for leave to exceed the page limit, all parties' motions for leave to exceed the page limit will be granted.

**B.**     **Defendants' Motions for Summary Judgment**

      **1.**     ***Withdrawn and Remaining Claims***

At the outset, Plaintiffs have conceded that they cannot continue to maintain some of their claims. Specifically, Plaintiffs have conceded dismissal of the following: (1) all claims against Meredith; (2) any state law claims against Defendant Edmonson County; and (3) any Fourth Amendment claims stemming from M.S. and C.S.'s injuries suffered as a result of the collision. (Pls.' Resp. Defs.' Mots. Summ. J. 1 n.1, 14 n.11, 22, DN 66). These claims will therefore be dismissed with prejudice. *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 194 (5th Cir. 2011) (dismissing claim with prejudice on motion for summary judgment after recognizing that "[s]ummary judgment . . . is the procedural equivalent of a trial and is an adjudication of the claim on the merits." (citation omitted)); *see also Kline v. Mortg. Elec. Sec. Sys.*, 154 F. Supp. 3d 567, 572 (S.D. Ohio 2015) (dismissing with prejudice abandoned claims on motion for summary judgment). Plaintiffs also arguably asserted an assault claim against Jones but make no mention of that claim in response to Jones' summary judgment motion on that claim. (Second Am. Compl. ¶ 20; Jones & Meredith Mem. Supp. Mot. Summ. J. 21-22; Pls.' Resp. Defs.' Mots. Summ. J. 14, 20). Because Plaintiffs have not opposed Jones' summary judgment motion on that claim, to the extent Plaintiffs intended to assert an assault claim against Jones, that claim will be dismissed with prejudice.

Plaintiffs' remaining claims currently at issue are: (1) a Fourth Amendment excessive force claim against Jones for tasing C.S.; (2) a Fourteenth Amendment claim against Jones for his

role in the pursuit that led to M.S. and C.S.'s injuries; (3) Section 1983 failure to train and supervise claims stemming from the pursuit  against Defendant Edmonson County and Defendant Shane Doyle ("Doyle"), the Edmonson County Sheriff; (4) state law negligence and gross negligence claims related to the pursuit against Jones and Doyle; and (5) a state law battery claim against Jones for use of force against C.S.  (Second Am. Compl. ¶¶ 6, 16-20).

### 2.   *Fourth Amendment Excessive Force Claim*

Plaintiffs' remaining Fourth Amendment claim against Jones alleges excessive force from Jones' tasing of C.S.  (Second Am. Compl. ¶ 17).  Jones seeks qualified immunity on this claim. (Jones & Meredith Mem. Supp. Mot. Summ. J. 13-16).

In determining whether Jones used excessive force against C.S. when tasing him, "the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citation omitted).  The Sixth Circuit has addressed an officer's invocation of the qualified immunity doctrine in the context of taser use and the reasonability of that taser use:

> In this qualified-immunity case, we have two questions to consider:  (1) whether Officer . . . violated [Plaintiff]'s constitutional rights when he tased . . . him; and, if so, (2) whether those rights were clearly established at the time of Officer['s] . . . actions . . . .  We can consider only the facts that were knowable to Officer . . . at the time of the incident.  . . . [W]e . . . construe disputed facts in the light most favorable to [Plaintiff], the non-moving party.
>
> Before asking whether Officer . . . violated [Plaintiff]'s rights, it makes sense to ask whether those rights were clearly established at the time of the incident.  The reason is simple:  If [Plaintiff]'s rights were not clearly established, Officer . . . is entitled to qualified immunity.  So we turn first to a "particularized" determination based on the facts at hand.  . . .
>
> This circuit—and several others—have drawn the line at the suspect's "active resistance."  If the suspect was actively resisting, use of a taser to subdue him was reasonable.  If not, then tasing was unreasonable.  We have found active resistance

where a suspect physically struggles with police, threatens or disobeys officers, or refuses to be handcuffed. But when a suspect is "compliant or ha[s] stopped resisting," the law is clearly established that using a taser constitutes excessive force.

. . .

[In *Eldridge v. City of Warren*, 533 F. App'x 529, 530 (6th Cir. 2013)], the officer tased a visibly "lethargic driver who clutched his car's steering wheel and provided unhelpful responses to the officers' queries. . . . The court found that tasing the driver was unreasonable because the suspect's "noncompliance was not paired with any signs of verbal hostility or physical resistance."

*Thomas v. City of Eastpointe*, 715 F. App'x 458, 459-62 (6th Cir. 2017) (internal citations omitted) (citation omitted).

As *Thomas* instructs, the starting point is what was known to Jones at the time of the incident. During the pursuit, Jones was told ammunition had been thrown out of the vehicle. (Jones Dep. 18:7-22). The pursuit ended when the car in which C.S. was riding was smashed on the passenger side by a third party's vehicle. (Jones Dep. 21:21-22:6; Pls.' Resp. Defs.' Mots. Summ. J. Ex. 11, DN 66-11). According to Jones:

Once I got [the driver] on the ground and cuffed, I then moved to the rear of the vehicle where I could see someone else. I could see an individual slumped over kind of rocking back-and-forth, give them multiple commands to show me their hands with no comp – or they didn't comply at all. I then pulled out my baton and broke the window because I couldn't get the door open, put my baton back up. The individual still would not show me their hands and was still rocking back-and-forth hiding their hands. Due to [officers] telling me that there's ammunition, I – I figured that there could have been a weapon of some sort inside the vehicle that they were trying to conceal from me. It's at that time I activated my taser and gave the commands again and no comply. I deployed the taser into the back region of this male.

(Jones Dep. 25:8-23). Jones also testified that his observation of C.S. "rocking back-and-forth" could have been due to the car itself rocking back and forth as the car was coming to a rest. (Jones Dep. 56:4-16).

7

Jones' primary reason articulated for the use of force was noncompliance.  As explained in *Eldridge*, however, "noncompliance . . . not paired with any signs of verbal hostility or physical resistance . . . cannot be deemed active resistance." *Eldridge*, 533 F. App'x at 535 (citation omitted).  And, if a suspect is not "actively resisting, . . . tasing [is] unreasonable." *Thomas*, 715 F. App'x at 460 (citations omitted).  Additionally, the Sixth Circuit in *Correa v. Simone*, 528 F. App'x 531 (6th Cir. 2013), rejected the assertion that an officer's suspicion that an individual possesses a firearm in and of itself justifies the officer's use of a taser.  *Id*. at 533-36.  "The precedent in this Circuit clearly holds that a police officer must encounter some level of resistance by the defendant to justify using a taser.  The mere possession of a gun is not, in and of itself, resistance unless coupled with something more, such as a physical or verbal action." *Id*. at 535-36.  Finally, as for C.S.'s moving or rocking back and forth, Jones himself did not attribute C.S.'s movements in this regard as verbal hostility or physical resistance but rather an attempt to conceal something from Jones.  In sum, "it is unreasonable to tase a nonresisting suspect[,]" and a "[plaintiff's] right to be free from a taser shock is clearly established where they have done nothing to resist arrest . . . ." *Eldridge*, 533 F. App'x at 533 (citation omitted); *Correa*, 528 F. App'x at 535.  Accordingly, Plaintiffs have established both that Jones is not entitled to qualified immunity and that a genuine issue of material fact exists as to whether Jones used excessive force against C.S. in violation of C.S.'s Fourth Amendment rights.

Jones also argues that because C.S. was purportedly unconscious during the tasing, suffered no injuries and received no treatment as a result of the tasing, and did not even know of the tasing until someone else told him about it, C.S. suffered no actual injury, so his excessive force claim should be dismissed.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 17).  Plaintiffs' respond to this argument by asserting that C.S. can potentially recover nominal damages for Jones' alleged

excessive force.  (Pls.' Resp. Defs.' Mots. Summ. J. 27, DN 66).  The closest the Sixth Circuit has

come to explicitly holding that a Fourth Amendment excessive force claim may proceed on

nominal damages, even when the plaintiff has not suffered an actual injury, is its decision in

*Morrison v. Board of Trustees of Green Township*, 583 F.3d 394 (6th Cir. 2009).  In *Morrison*, the

plaintiff brought a Fourth Amendment excessive force claim based on an officer pushing her face

into the ground whenever the plaintiff tried to talk while she lay handcuffed and prone in a

neighbor's yard.  *Id*. at 404.  The Sixth Circuit addressed the plaintiff's claim as follows:

> Officer Celender separately argues that the nature and extent of the injuries alleged
> by [Plaintiff] as a result of the pushing of her face into the ground are fatal to her
> excessive force claim.  He contends [Plaintiff] "sustained no real injury," relying
> heavily on the fact that [Plaintiff] described her injury as a "minor scratch, not even
> deep enough to cause [the skin] to bleed," and likened it to when "you scratch
> yourself with your fingernail [and] it just kind of turns red."

> Officer Celender essentially asks this Court to impose a blanket *de minimis* injury
> requirement for excessive force claims. . . . But while an excessive use of force
> claim *may* be established through evidence of severe injury or physical contact, this
> Court has not required that this *must* be the case.  Rather, we have held that a
> plaintiff may "allege use of excessive force even where the physical contact
> between the parties did not leave excessive marks or cause extensive physical
> damage.  We have gone so far as to state that the "extent of the injury inflicted" is
> not "crucial to an analysis of a claim for excessive force in violation of the Fourth
> Amendment."

> "Gratuitous violence" inflicted upon an incapacitated detainee constitutes an
> excessive use of force, even when the injuries suffered are not substantial.  In
> *Pigram*, it was alleged that the defendant police officer slapped the handcuffed
> plaintiff in the face because the latter was being unruly and had a "smart-ass
> mouth."  Finding the defendant's conduct to be unreasonable under the Fourth
> Amendment for the purposes of summary judgment, *Pigram* emphasized that a
> "slap to the face of a handcuffed suspect—even a verbally unruly suspect—is not a
> reasonable means of achieving anything more than perhaps further antagonizing or
> humiliating the suspect."  The Court reached this conclusion notwithstanding the
> relatively minimal use of force applied *and the absence of any resulting injury*.

> As in *Pigram*, [Plaintiff] alleges that Officer Celender applied force to her head
> when she posed no threat to officer safety.  She specifically claims Officer Celender
> repeatedly pushed her face to the ground every time she attempted to speak while
> she was already handcuffed, lying down, and compliant with the officer's

> commands.  Given that we must assume on summary judgment that a reasonable
> officer would not have felt a threat to officer safety under the circumstances, Officer
> Celender's alleged behavior represents the sort of "gratuitous violence" which we
> have found unconstitutional in *Pigram*.  Such "antagonizing" and "humiliating"
> conduct is unreasonable under the Fourth Amendment, *regardless of the existence
> of injury*, and crosses the line "into physical abuse of an incapacitated suspect."

*Id*. at 406-07 (third emphasis added) (citations omitted) ; *see also Ealy v. City of Dayton*, 103 F.3d 129, 1996 WL 724368, at *5 (6th Cir. 1996) (discussing issue of whether a plaintiff is automatically entitled to nominal damages on a Fourth Amendment excessive force claim and noting that "the Supreme Court has said that the violation of a constitutional right should be 'actionable' for nominal damages without proof of actual damages . . . ." (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978))); *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 634 (6th Cir. 2013) (favorably citing *Slicker v. Jackson*, 215 F.3d 1225, 1231-32 (11th Cir. 2000)); *Prado v. Thomas*, 2019 WL 1283823, at *11 n.10 (S.D. Ohio Mar. 20, 2019) ("[A]ssuming excessive force is established, without proof of compensatory damages, a plaintiff has only a technical violation [of the Fourth Amendment] and a claim for nominal damages."); Bryan N. Georgiady, *An Excessively Painful Encounter:  The Reasonableness of Pain and De Minimis Injuries for Fourth Amendment Excessive Force Claims*, 59 Syracuse L. Rev. 123, 138 (2008) ("[T]he Sixth . . . Circuit[] ha[s] expressly repudiated actual injury requirements for all excessive force claims except claims based on allegations of tight handcuffing."  (citations omitted)).

Based on all of the aforementioned, even though C.S. has apparently conceded that he suffered no actual injury, C.S. may still recover nominal damages should he prove his Fourth Amendment excessive force claim to the jury.  Summary judgment on C.S.'s Fourth Amendment excessive force claim therefore cannot be granted in favor of Jones based on his argument that C.S. suffered no actual injury.

For all of these reasons, Jones' motion for summary judgment on C.S.'s Fourth Amendment excessive force claim will be denied.

### 3.   *Fourteenth Amendment Claim*

Plaintiffs also assert a Fourteenth Amendment substantive due process claim against Jones based on Jones' conduct during the pursuit.  (Second Am. Compl. ¶¶ 16-18).  Jones seeks the protection of qualified immunity to bar this claim.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 12-13).

As it relates to a Fourteenth Amendment claim for a defendant-officer's actions during a police pursuit, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment . . . ." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998).  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted) (citation omitted).  In *Jones v. Byrnes*, 585 F.3d 971 (6th Cir. 2009), the Sixth Circuit specifically addressed the qualified immunity doctrine as it relates to Fourteenth Amendment police pursuit cases:

> [E]ven if the officers' actions did rise to the level of violating [Plaintiff's] constitutional rights, it was not clearly established at the time of the incident that actions of that sort crossed the constitutional line.  Neither side has cited any case, from any circuit or district court, in which an officer's actions in a police chase have ultimately been found to shock the conscience, nor are we aware of any such case.  As a result, although *Lewis* established in 1998 that an officer's conduct in a police chase could theoretically shock the conscience, there have been no examples of what specific kinds of conduct rise to that level.  The "clearly established" inquiry "must be undertaken in consideration of the specific context of the case, not as a broad general proposition . . . ."  Thus, at present, it would be exceedingly difficult for an officer to be aware of what specific actions violate the clearly established general right of suspects and third parties to be free from arbitrary deprivation of life and liberty in police-pursuit scenarios.  Certainly [the officer defendants] had no guidance from this Court or the Supreme Court on what *would*

> shock the conscience, just what *would not*.   The officers, therefore, would be
> entitled to qualified immunity even had we found that their actions shocked the
> conscience.

*Byrnes*, 585 F.3d at 978 (internal citation omitted).  The Court in *Byrnes* also noted that "[s]everal

district courts have denied summary judgment in police-pursuit cases on the basis that a jury could

find that the officer's conduct shocked the conscience, but all of those courts have been reversed

on appeal." *Id*. at 978 n.4 (citing *Meals v. City of Memphis*, 493 F.3d 720, 730-31 (6th Cir. 2007)).

The parties' briefs and the Court's own research confirms the scarcity of case law

establishing the contours of unacceptable police pursuit for Fourteenth Amendment liability

purposes.   That being said, the Sixth Circuit in *Byrnes* appears to have overlooked the Fifth

Circuit's decision in *Checki v. Webb*, 785 F.2d 534 (5th Cir. 1986), which was viewed as clearly

established precedent on this issue in *Meals*.   Although *Checki* was decided before the U.S.

Supreme Court's seminal decision on Fourteenth Amendment police pursuit liability in *Lewis*,

*Checki* was cited in *Lewis* and is consistently cited by modern courts, including the Sixth Circuit

in *Meals*, as establishing the benchmark for conduct that *does* shock the conscience in violation of

an individual's Fourteenth Amendment rights.  *See, e.g.*, *Lewis*, 523 U.S. at 854 n.13; *Meals*, 493

F.3d at 730; *Steen v. Myers*, 486 F.3d 1017, 1024 (7th Cir. 2007) ("Although *Checki* predates

*Lewis*, and comes to us from another circuit, we consider it for persuasive purposes, particularly

in light of the fact that the Court in *Lewis* cited to it with approval."  (citation omitted)); *Helseth*

*v. Burch*, 258 F.3d 867, 872 (8th Cir. 2001) (noting that "the Court in *Lewis* cited [to *Checki*] as

an example of intent to cause harm unrelated to the legitimate object of an arrest."  (citing Lewis,

523 U.S. at 854 n.13).

The question for this Court is whether the facts of the case *sub judice*, compared to the

facts of *Checki, Meals*, and *Byrnes*, allow Plaintiffs' Fourteenth Amendment claim to proceed.  In

support of their argument that Jones intended to harm them, Plaintiffs point to the length of the chase, the high speeds reached, and the arguably minor crimes of an unilluminated license plate and a seat belt violation giving rise to the traffic stop leading to the pursuit.  (Pls.' Resp. Defs.' Mots. Summ. J. 22-24).[1]  The plaintiffs in *Meals* similarly pointed to the fact that the officers pursued the suspect for a traffic violation at high rates of speeds and after "the pursuit has reached an unacceptable level," yet the Court there found no Fourteenth Amendment violation.  *Meals*, 493 F.3d at 723-24.  In any event, the pursuit's level of acceptability in terms of speed, length, and suspected crime do not appear to have been the kinds of indicia that the Court in *Checki* found to have shed light on an officer's intent to harm.  Rather, there are two key facts separating *Checki* on one hand and *Meals* and *Byrnes* on the other:  (1) the absence of any indication to the suspects in *Checki* that the officers were law enforcement for the first 20 miles of the chase; and (2) the officers' post-pursuit conduct in *Checki* of striking the plaintiff with a revolver after having already handcuffed him and breaking the plaintiff's companion's arm and subjecting him to verbal abuse.  *Checki*, 785 F.2d at 535-36.

In contrast, in the present case Jones had his lights and siren on the entire pursuit.[2]  (Jones Dep. 21:3-7).  The only arguable similarity between the case at hand and *Checki* is the existence of post-pursuit physical acts perpetuated by an officer against the plaintiff.  Jones punched the

---

[1] In this case, the pursuit lasted 18 miles, while the pursuit in *Checki* lasted 31 miles and in *Byrnes* no shorter than six miles.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 3; Jones Dep. 21:21-22:6, 44:2-7; Meredith Dep. 12:13-23); *Checki*, 785 F.2d at 535; *Byrnes*, 585 F.3d at 974.  Jones did not initiate the pursuit and only joined in after pursuit began, but it is unclear at what point. (Pls.' Resp. Defs.' Mots. Summ. J. 6; Jones Dep. 14:25-15:18).

[2] Interestingly, the fact that the officer in *Meals* turned off her lights and siren when pursuing the suspect still did not convince the Sixth Circuit that the officer in *Meals* "inten[ded] to harm [the] suspect[] physically or to worsen [his] legal plight . . . ."  *Meals*, 493 F.3d at 730 (internal quotation marks omitted) (quoting *Lewis*, 523 U.S. at 854).  Regardless, the case at hand is distinguishable from *Checki* and identical to *Byrnes*, as Jones had his lights and siren on the entire pursuit.

driver of the vehicle in the head, allegedly because he believed the driver to be attempting to escape, and tased C.S, allegedly because he thought C.S. was harboring a weapon and because C.S. was unresponsive to his commands.  (Jones Dep. 24:21-25, 25:8-23, 47:3-13, 53:23-54:3).  In *Checki*, the officer struck the plaintiff with a revolver after having already handcuffed him and broke the plaintiff's companion's arm and subjected the companion to verbal abuse.  *Checki*, 785 F.2d at 536.  Even Jones' use of physical force after the accident is different from the officers' use of physical force in *Checki*, however.  Jones was essentially in the process of subduing the driver and C.S., whereas the officer in *Checki* physically abused the plaintiff and physical and verbally abused the plaintiff's companion *after* those individuals where already subdued.  Additionally, there is no allegation that Jones verbally abused anyone involved in the pursuit.[3]

Although Plaintiffs believe Jones' post-accident conduct reveals an intent to harm during the pursuit, Plaintiffs point to no evidence establishing any greater culpability on the part of Jones than objective unreasonableness.  In other words, Plaintiffs point to no evidence challenging Jones' assertion that he punched Embry to prevent him from escaping and that he tased C.S. because he thought C.S. may have had a weapon and was not responding to his commands.  While a jury could find that these acts were objectively unreasonable under a Fourth Amendment excessive force standard, Plaintiffs do not present any evidence challenging Jones' assertion that his intent in taking physical action against Embry and C.S. was to subdue them instead of some sort of a continuation of an intent to harm those individuals during the pursuit.[4]

---

[3] Although it is true that Jones admitted he had a history with Embry, Plaintiffs do not challenge Jones' assertion that he did not recognize Embry until after the collision, specifically, when he saw Embry attempt to exit the vehicle.  (Jones Dep. 22:10-23:5, 24:21-25, 45:6-17, 68:18-23).

[4] Plaintiffs could have, for example, deposed Embry who is not only a witness in this case but also a third-party defendant.  (Third Party Compl. ¶ 4, DN 9).  Embry may have provided testimony challenging Jones' assertion that Embry's attempt to escape necessitated physical force, for example, by asserting that he in fact obeyed Jones' commands and was not attempting to escape.

The Court here is constrained to conclude that Jones is protected by qualified immunity on Plaintiffs' Fourteenth Amendment claim against him.  As the Sixth Circuit in *Byrnes* noted, there is scant precedent that clearly establishing specific actions that violate the right of suspects to be free from arbitrary deprivation of life and liberty in police-pursuit scenarios.  Moreover, the facts of the case at hand are simply too different from the only cited pertinent case, *Checki*, holding that law enforcement's intent to harm a suspect physically or worsen his legal plight[5] is a jury question.  For these reasons, summary judgment will be granted in Jones' favor on Plaintiffs' Fourteenth Amendment claim against him stemming from the pursuit.  Plaintiffs' claim in this regard will be dismissed with prejudice.

### 4.    *Failure to Train and Supervise Claims*

Although Plaintiffs originally asserted failure to train and supervise claims against Doyle in his individual capacity and Edmonson County based both on the pursuit and on Jones' tasing of C.S., it appears that Plaintiffs continue to maintain such claims based only on the pursuit.  (Second Am. Compl. ¶ 17; Pls.' Resp. Defs.' Mots. Summ. J. 24-26).  Importantly, Plaintiffs' claims against Doyle and Edmonson County for failure to train and supervisory liability based on Jones' pursuit

---

Had Plaintiffs challenged Jones' true intent in this way, such post-pursuit use of force could have shed light on Jones' intent during the pursuit.  *See Johnson v. Baltimore Police Dep't*, No. 18-CV-2375-SAG, 2020 WL 1694349, at *11 (D. Md. Apr. 7, 2020) (officers post-pursuit conduct of planting drugs and falsifying police reports evidenced officers' intent during pursuit).

[5] Plaintiffs allege an intent to harm them on the part of Jones but nothing specific as it pertains to Jones worsening their legal plight.  (Second Am. Compl. ¶¶ 2, 8, 16-17; Pls.' Resp. Defs.' Mots. Summ. J. 9-10, 22-24); *see Philebaum v. Myers*, No. 1:04-CV-218-TS, 2006 WL 335518, at *15 (N.D. Ind. Feb. 13, 2006) ("[T]he language regarding intent to worsen the legal plight of a suspect applies to cases involving an intent to do something other than physically harm[ing] a suspect that shocks the conscience.  The facts of *Checki* provide an example.  Though it is unclear what the officer's intent was in chasing the car for twenty miles without activating lights and sirens, one can imagine several conscience-shocking motives other than causing physical harm.  Perhaps the chase of an innocent motorist was intended to give the appearance of cause to arrest the motorist, collect a greater fine, or seize his car."  (discussing *Slusarchuk v. Hoff*, 346 F.3d 1178, 1183 (8th Cir. 2003))).

require Plaintiffs to first demonstrate that Jones violated Plaintiffs' constitutional rights. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("Plaintiff argues that the City of Battle Creek and the Calhoun County Sheriff failed to properly train the individual defendants . . . .  If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citation omitted)).  Because Plaintiffs are unable to demonstrate that Jones violated their Fourteenth Amendment rights as it pertains to the pursuit, Plaintiffs' failure to train and supervise claims against Doyle and Edmonson County will be dismissed with prejudice, as well.

### 5.  *Battery Claim*

Plaintiffs also assert a battery claim against Jones for tasing C.S.  (Second Am. Compl. ¶ 20).  Jones reiterates his previous argument made that C.S. suffered no actual damages, so Jones cannot be held liable for battery.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 21).  This argument is easily dispensed with:  "A plaintiff need not prove actual damages in a claim for battery because a showing of actual damages is not an element of battery and, when no actual damages are shown for a battery, nominal damages may be awarded." *Vitale v. Henchey*, 24 S.W.3d 651, 659 (Ky. 2000) (citations omitted).  This is the only specific argument Jones makes in support of his contention that Plaintiffs' battery claim for tasing C.S. should be dismissed.[6] Jones' motion for summary judgment on this claim will be denied.

---

[6] Jones invokes Kentucky Revised Statutes ("KRS") 503.090(1) as protection against Plaintiffs' negligence and gross negligence claims against him.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 22-24, 30; Defs.' Reply Mots. Summ. J. 29).  The entirety of Jones' argument for the application of KRS 503.090(1) to protect him from Plaintiffs' battery claim is a one-sentence statement in his

### 6.   *Negligence and Gross Negligence Claims*

The final set of claims at issue are Plaintiffs' negligence and gross negligence claims against Jones and Doyle for their roles in the pursuit that eventually culminated in C.S. and M.S. suffering injuries.   "In any negligence case, a plaintiff must prove the existence of a duty, breach of that duty, causation between the breach of duty and the [plaintiffs'] injury, and damages." *Hayes v. D.C.I. Props.-D KY, LLC*, 563 S.W.3d 619, 622 (Ky. 2018); *see also McIntosh v. Data RX Mgmt., Inc.*, No. 5:13-CV-140-TBR, 2014 WL 774609, at *5 n.5 (W.D. Ky. Feb. 25, 2014) (noting that under Kentucky law, gross negligence claim has the same elements as a negligence claim).   "Ordinary negligence is 'the absence of ordinary care,' and gross negligence is 'the absence of slight care.'"  *Brotherton v. Victory Sports, Inc.*, 24 F. Supp. 3d 617, 620 (E.D. Ky. 2014) (citations omitted).   Jones and Doyle make several arguments supporting summary judgment in their favor on these claims.

### a.   **Jones**

To start, Jones questions whether he owed a duty of care to C.S. and M.S. in this case. Jones acknowledges that KRS 189.940(7) and the Kentucky Supreme Court's decision in *Gonzalez v. Johnson*, 581 S.W.3d 529 (Ky. 2019), establish a duty of care owed by the "driver of any emergency or public safety vehicle . . . to drive with due regard for the safety of all persons and property . . . ."  KRS 189.940(7); *Gonzalez*, 581 S.W.3d at 535 (analyzing KRS 189.940(7)). However, Jones cites to this Court's decision in *Walker v. Davis*, 643 F. Supp. 2d 921 (W.D. Ky. 2009), for the proposition that "the Court questions whether a pursuing police officer owes a duty of care to fleeing suspects. . . . [C]ourts from other jurisdictions that have addressed the question[]

---

reply.   (Defs.' Reply Mots. Summ. J. 29).   In any event, as explained in the next section, Defendants' application of KRS 503.090(1) is flawed.

have found that police officers do not owe such a duty to fleeing suspects." *Id*. at 933 n.10.  In other words, while Jones recognizes that Kentucky mandates officers exercise due regard for the safety of the public generally when driving, Jones argues that duty is abrogated as it pertains to a fleeing suspect.

The first problem with Jones' argument is that he has not established that C.S. and M.S. were "fleeing suspects"; rather, C.S. and M.S. were minors riding in the car of the actual fleeing suspect at the time of the pursuit.  Even accepting Jones' contention that he owed no duty to fleeing suspects to exercise reasonable care in his pursuit, Jones does not explain how anyone besides the driver of the vehicle in this case can be properly characterized as a "fleeing suspect."  More importantly, even if C.S. and M.S. could be characterized as fleeing suspects, Jones cites to no Kentucky precedent establishing that an officer owes no duty of care to a fleeing suspect in pursuit.  Indeed, KRS 189.940(7) mandates that officers "drive with due regard for the safety of *all* persons . . . ."  (emphasis added); *see also Pile v. City of Brandenburg*, 215 S.W.3d 36, 42 (Ky. 2006) ("All owners, operators and persons in control of motor vehicles owe a duty to all other persons using the roadway pursuant to KRS 304.39, the Motor Vehicle Reparations Act.  There is nothing in that Act that exonerates police officers from the duty of care not to be negligent in the operation or control of their vehicle.").  This Court will not create a carveout to a police officer's general duty of care owed to *all* persons when operating their vehicles absent precedent under Kentucky law.

Next, citing to several non-Kentucky cases, Jones argues that whether a defendant exercised ordinary care is a question of law for the Court.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 18).  This argument is easily dispelled:

> Plaintiff contends that when the facts are not in dispute the issue of negligence is one of law and the court should have directed a verdict for him.  Plaintiff misconceives the law.  It is only where but one reasonable conclusion of negligence or non-negligence can be drawn by fair minded men that the court may decide the

18

> issue as a matter of law.  If different conclusions or inferences from the evidence may be reached by reasonable men, then the question is for the jury.  Even if the facts are uncontroverted, the inferences of negligence or non-negligence are for the jury.  This is so whenever there is room for honest differences of opinion as to the effect of facts or reasonable inferences to be drawn therefrom.

*Middleton v. Partin*, 347 S.W.2d 75, 76 (Ky. 1961) (internal citations omitted) (citation omitted).

In other words, Jones must establish that only one reasonable conclusion of non-negligence can be drawn by fair minded individuals; otherwise, summary judgment in his favor must be denied.

On that point, Jones cites to no relevant case law establishing that his actions satisfied his duty of ordinary care as a matter of law.  More specifically, Jones cites to no Kentucky precedent[7] establishing that police are not negligent as a matter of law when pursuing a suspect for 12 minutes covering 18 miles and reaching speeds of around 120 miles per hour.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 3, 18-20; Jones Dep. 21:21-22:6, 44:2-7, Nov. 4, 2019, DN 68-3; Meredith Dep. 12:13-23).  Nor does Jones cite to any pertinent decision establishing that he was not grossly negligent under the facts of this case as a matter of law.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 20).  It is simply for the jury, not this Court, to determine whether Jones exercised ordinary or any care in the pursuit.[8]

Jones next Jones seeks to invoke the protection of KRS 503.090(1), which provides:

> The use of physical force by a defendant upon another person is justifiable when the defendant, acting under official authority, is making or assisting in making an arrest, and he:

---

[7] While Jones cites to *Roach v. City of Fredericktown*, 882 F.2d 294 (8th Cir. 1989), and *Galas v. McKee*, 801 F.2d 200 (6th Cir. 1986), these cases do not interpret Kentucky law on this issue. (Jones & Meredith Mem. Supp. Mot. Summ. J. 18).

[8] In their reply, Defendants contend that Plaintiffs cannot satisfy the causation element either. (Defs.' Reply Mots. Summ. J. 19).  Yet the Kentucky Supreme Court in *Gonzalez* established that "an officer can be the cause-in-fact and legal cause of damages inflicted upon a third party as a result of a negligent pursuit." *Gonzalez*, 581 S.W.3d at 535.  Defendants completely ignore the fact that *Gonzalez* establishes that the actions of law enforcement involved in a pursuit can be the cause of a party's injuries correlated with the pursuit.  Factually, it is for the jury to decide whether Defendants' pursuit caused C.S. and M.S's injuries.

(a)     Believes that such force is necessary to effect the arrest;

(b)     Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and

(c)     Believes the arrest to be lawful.

KRS 503.090(1).  Jones appears to urge that as long as he satisfies the elements of KRS 503.090(1), he is immune from any liability stemming from his pursuit.  (Jones & Meredith Mem. Supp. Mot. Summ. J. 22-24).  Jones is mistaken:  "[A]lthough an officer may be justified in using force against a person, any defense of justification or privilege is lost if the force used is excessive."  *Brown v. Fournier*, No. 2015-CA-001429-MR, 2017 WL 2391709, at *6 (Ky. App. June 2, 2017) (citations omitted).  Under Kentucky law, simply meeting the requisites of KRS 503.090(1) does not automatically preclude the imposition of civil liability for an officer's use of force.  More importantly, KRS 503.090(1), which justifies an officer's use of force, is inapposite here; Jones cites to no precedent for the assertion that a police pursuit in and of itself constitutes the use of force by law enforcement.  In fact, in *Galas*, a case Jones cites in support of his motion, the Sixth Circuit concluded, "[b]y engaging in high-speed pursuits, without more, police use absolutely no force."  *Galas*, 801 F.2d at 203.  A statute that only justifies an officer's use of force does not apply to protect an officer in a situation where no force is used.

Jones' final argument seeks to invoke Kentucky's qualified immunity doctrine.  "The Court must apply Kentucky law to determine whether Defendants are entitled to immunity from state tort liability . . . ."  *Funke v. Coogle*, No. 3:11-CV-310-H, 2013 WL 209602, at *2 (W.D. Ky. Jan. 17, 2013) (citing *Lexington-Fayette Urban Cty. Gov't*, No. 06-299-JBC, 2007 WL 101862, at *4 (E.D. Ky. Jan. 10. 2007); *King v. Taylor*, 694 F.3d 650, 662-64 (6th Cir. 2012)).  Under Kentucky law:

> [P]ublic officers and employees are entitled to "qualified official immunity" for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (*i.e.*[,] were not made in "bad faith"), and (3) were within the scope of the employee's authority.   Conversely, no immunity is afforded for the negligent performance or omissions of a ministerial act, or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive, *i.e.*, again the "bad faith" element.

*Rowan Cty. v. Sloas*, 201 S.W.3d 469, 475-76 (Ky. 2006) (internal citations omitted) (citation omitted).   In that vein, precedent dictates that the initiation, continuation, and termination of a police pursuit is generally a ministerial act to which qualified immunity does not attach.   *Chastain v. Ansman*, No. 3:07-CV-601-S, 2009 WL 2761740, at *3 (W.D. Ky. Aug. 31, 2009) ("The act of safely driving a police cruiser, even in responding to an emergency, is not a discretionary function."  (citing *Jones v. Lathram*, 150 S.W.3d 50, 53-54 (Ky. 2004))); *Walker v. Davis*, 643 F. Supp. 2d 921, 933 (W.D. Ky. 2009) ("[The officer]'s driving during the pursuit is controlled by *Jones*."); *Mattingly v. Mitchell*, 425 S.W.3d 85, 90-91 (Ky. App. 2013) (an officer's discretion in "initiating and continuing a pursuit" is limited by police department's policies and is therefore a ministerial act); *Browder v. Fentress*, No. 2013-CA-002178-MR, 2018 WL 3202975, at *3 (Ky. App. June 29, 2018) (Because "[t]he Hardin County Sheriff's Department has specific and comprehensive procedures that deputies are required to follow when initiating, continuing, and terminating vehicular pursuits of suspects.  . . . Accordingly, the [pursuit] was ministerial, not discretionary.").

There are two reasons why Jones is not entitled to qualified immunity here.   First, *Walker* and *Chastain* dictate that Jones' actions during the pursuit are ministerial, which are not protected by qualified immunity.   Second, *Mattingly* and *Browder* provide that an officer's initiation, continuation, and termination of a pursuit are all ministerial acts when dictated by law enforcement

departmental policies.   The Edmonson County Sheriff's Office ("ECSO") policy regarding "Pursuit and Emergency Response Driving" states:

> K.R.S. Chapter 189 sets forth traffic law exemptions for the operation of emergency vehicles during vehicular pursuits . . . but, at the same time, mandates due regard for the safety of all persons and property on the highway.  The E.C.S.O. will apprehend fleeing violators when conditions exist that do not endanger the lives, property, or safety of motorists, citizens or other members of the E.C.S.O.  The protection of life and property must be the primary concern in the operation of emergency vehicles.
>
> It is impossible to develop guidelines to cover every conceivable situation that may occur.  Therefore, it is important that all employees follow the guidelines outlined in the following directive, exercise their best judgment in emergency vehicle operation, and fully utilize their training, experience, and common sense.
>
> The decision to initiate pursuit . . . driving will be discretionary with each individual officer.  The officer must weigh the need for immediate apprehension against the risk created to all others by the pursuit.  The factors to be considered in initiating and continuing a pursuit . . . should include, but are not limited to the following:
>
> 1. Seriousness of the . . . violators offence (i.e., if the offender is allowed to flee, he would present a danger to human life or cause serious physical injury.);
> 2. Identify the offender, if known, and the likelihood of apprehension;
> 3. Factors such as pursuit/emergency response speed, weather, roadway conditions, time of day, location of the pursuit/emergency response, and the condition and capabilities of the pursuit and pursued vehicles.;
> 4. Amount of vehicular and pedestrian traffic.
>
> OFFICER RESPONSIBILITIES IN EMERGENCY RESPONSE DRIVING
>
> 1. The officer shall have his siren and emergency lights operational and shall continue to have them operational throughout the emergency response driving situation.
> 2. The officer will notify dispatch when initiating the pursuit, all information about the pursued vehicle, location, direction of travel, and upon terminating the pursuit.
> 3. The officer will use extreme caution in condensed traffic areas such as commercial, residential, or school zones.
> 4. The officer shall slow down upon approaching any red light or stop sign, and only proceed through when it is safe to do so.
> 5. The officer will operate his emergency vehicle with due regard for the safety of all persons and property upon the highway.
> 6. The officer will maintain reasonable control of his vehicle at all times.

> 7. The officer will use his discretion and terminate the pursuit if the danger to human life is greater than the need to continue the pursuit.  Is the pursued person a danger to the public if not apprehended?

(Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3, DN 66-1).

ECSO's pursuit policy is not materially different from the policies at issue in *Mattingly* and *Browder*.  *Compare* (Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3), *with Mattingly*, 425 S.W.3d at 87-88 *and Browder*, 2018 WL 3202975, at *2.  Obviously, all three policies possess discretionary elements.  *See* (Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3); *Mattingly*, 425 S.W.3d at 87-88; *Browder*, 2018 WL 3202975, at *2.  As noted in *Mattingly*, however, "[b]ecause few acts are purely discretionary or purely ministerial, the courts must look for the '*dominant* nature of the act.'"  *Mattingly*, 425 S.W.3d at 89-90 (quoting *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010)).

ECSO's policy requires officers to weigh a list of factors but leaves the ultimate decision to initiate pursuit in the hands of the officer; similarly, while the policies at issue in *Mattingly* and *Browder* outline a series of pursuit determinations an officer must make, those policies still placed the ultimate decisions surrounding a pursuit in the hands and discretion of the officer.  (Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3); *see Mattingly*, 425 S.W.3d at 87 ("The officer must weigh the immediate danger or potential danger to the public should the suspect be allowed to remain at large against the danger or potential danger created by the pursuit itself. . . . Pursuits shall be terminated when the risks created by continuing the pursuit outweigh the need for immediate apprehension."); *Browder*, 2018 WL 3202975, at *2 ("Pursuit, especially prolonged high-speed pursuit should be used only as a last resort; whenever safer alternative actions are possible, they should be taken. . . . The responsibility for initiating the pursuit rests with the individual deputy . . . . Deputies [w]ill [t]erminate a [p]ursuit [w]hen . . . [t]he circumstances of the pursuit present an extreme safety

hazard to the public, the deputy, or the suspect."). Although written in mandatory language, the policies in *Mattingly* and *Browder* still put the final risks/benefits analysis in the hands of the officer, just like the ECSO policies. Importantly, even with this discretion, the courts in *Mattingly* and *Browder* found the "dominant nature" of an officer's actions surrounding a pursuit to be ministerial. *Mattingly*, 425 S.W.3d at 90-91; *Browder*, 2018 WL 3202975, at *3.

Additionally, the ECSO policies seemingly remove discretion regarding conduct taken during the pursuit, evidenced by items one through six under the "Officer Responsibilities" section. (Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3). Although the policies at issue here explicitly state that the decision to terminate a pursuit requires the officer to "use his discretion[,]" the policies then remove that discretion by mandating the officer terminate the pursuit "if the danger to human life is greater than the need to continue the pursuit. Is the pursued person a danger to the public if not apprehended?" (Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3). ECSO's termination policy is essentially the same as those in *Mattingly* and *Browder*, which require an officer to terminate a pursuit "when the risks created by continuing the pursuit outweigh the need for immediate apprehension" and when "[t]he circumstances of the pursuit present an extreme safety hazard to the public, the deputy, or the suspect." *Mattingly*, 425 S.W.3d at 88; *Browder*, 2018 WL 3202975, at *2.

In sum, the policies at issue in the case *sub judice* do not materially differ from those in *Mattingly* and *Browder*, policies that were deemed to establish ministerial duties on the part of pursuing officers. As such, qualified immunity is unavailable to Jones as protection from Plaintiffs' negligence and gross negligence claims stemming from Jones' pursuit-related conduct.

For all of the aforementioned reasons, Jones' motion for summary judgment on Plaintiffs' negligence and gross negligence claims will be denied.

### b.    Doyle

Plaintiffs allege negligence and gross negligence on the part of Sheriff Doyle for his involvement in the pursuit.  Doyle argues both for qualified immunity from these claims and that he was not negligent or grossly negligent as a matter of law.  (Doyle Mem. Supp. Mot. Summ. J. 20-27, DN 57-1; Defs.' Reply Mots. Summ. J. 25-29).

This Court in *Walker* applied Kentucky's qualified immunity doctrine to the factual circumstances surrounding a sheriff's supervision of a pursuit:

> It is true that under Kentucky law, the "[p]romulgation of rules is a discretionary function[,]" and the "enforcement of those rules is a ministerial function."  It [is] also true that [the sheriff] enacted a policy for [the] [c]ounty that may have been violated several times during [the sheriff's] tenure, including during the pursuit of [the suspect].  However, the policy charges those officers involved in the pursuit and those supervising the pursuit with the enforcement of the policy.  Therefore, only to the extent [the sheriff] is performing one of those functions would he be under a duty to comply with the policy's directives.  Here, the plaintiff does not contend that [the sheriff] was involved in the pursuit of [the suspect].  Nor does the plaintiff point to any policy that required [the sheriff] to supervise the enforcement of the pursuit policy in any particular manner.  Under such circumstances, the manner in which he supervises the pursuit policy is discretionary in nature.

*Walker*, 643 F. Supp. 2d at 933-34 (internal citations omitted) (citation omitted).

As *Walker* instructs, if a policy instructs a sheriff to supervise a pursuit and enforce pursuit policies during that pursuit, or if the sheriff is not the named supervisor but still undertakes those duties, the sheriff's supervision over the pursuit is a ministerial act, thus precluding the sheriff from invoking qualified immunity.  The ECSO's Policy and Procedures Manual Chapter 11 states: "Every deputy of the department assigned to operate a departmental vehicle shall be held accountable for the proper use and care of the vehicle. . . . Supervisors will be responsible to ensure compliance with this criteria."  (Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 1).  Although which supervisors must ensure compliance is not specified, Doyle admitted that he generally possesses the duty "to make sure that the deputies that work for [him] . . . follow policy and procedure."

25

(Doyle Dep. 6:1-13, Oct. 28, 2019, DN 68-2).  Doyle's involvement in the pursuit also evidences

that he could be characterized as a supervisor charged with enforcing the ECSO pursuit policies:

> Q      . . . Tell me what you remember about this particular pursuit that we're
>        talking about today.
> A      Well, I'd gotten a phone call from—I'm trying – I think it was my dispatch
>        center called me and said, "[Jones] has—[Jones] and [Meredith] are
>        involved in a pursuit.  They told me to let you know."  So I went and turned
>        my radio on to try to monitor radio traffic the best I could.  At that time, the
>        radio system we had was having a lot of problems.  So I was catching some,
>        not catching some, because I was listening on a little handheld inside my
>        home—
> Q      Okay.
> A      —so I—I wasn't catching all the radio traffic, but I got a phone call from
>        Deputy Meredith.  I think it was [Meredith]'s phone, but actually, maybe
>        Devin Lindsey, who was another volunteer that was riding with him because
>        [Meredith] was driving—so Devin made the phone call to let, you know,
>        kind of give me a little bit of an update—
> Q      Uh-huh.
> A      —I just told him, you know, "Keep me informed on what's going on," and
>        then I got a phone call after that the pursued vehicle . . . had been involved
>        in a collision there in Bowling Green.  And so at that point, I just said, "All
>        right.  I'm on my way."  And I got ready and headed out the door.

(Doyle Dep. 16:23-17:23).  Doyle's involvement with the pursuit suggests that he had a ministerial

duty to enforce the ECSO policies during the incident.  As Doyle testified, dispatch notified him

of the pursuit because it was told to do so.  (Doyle Dep. 16:25-17:3).  Doyle also noted that

Meredith's passenger called him during the pursuit to give an update.  (Doyle Dep. 17:10-16).

Finally, Doyle followed the pursuit over the radio, in addition to telling Meredith's passenger to

"keep [him] informed."  (Doyle Dep. 17:3-20).  Even if there were no written policy establishing

a supervisory duty over pursuits on the part of Doyle, his actions would otherwise indicate such a

policy, i.e., requiring his employees to notify him of a pursuit so that he would ensure compliance

with the ECSO pursuit policies.  A policy requiring Doyle to ensure compliance with the ECSO

policies is a ministerial duty to which qualified immunity does not apply.  *See Hedgepath v.*

*Pelphrey*, 520 F. App'x 385, 391-92 (6th Cir. 2013) (Under Kentucky law, "the supervision of

employees is a ministerial act when it merely involves enforcing known policies." (citation omitted)).

There are factual issues in this case at this point that preclude the Court from characterizing Doyle's oversight of the pursuit at issue in this case as discretionary or ministerial. *See Sloas*, 201 S.W.3d at 475 (Only "once the material facts are resolved, whether a particular defendant is protected by official immunity a question of law . . . ." (citation omitted)). Although not entirely clear, the ECSO policies could reasonably be read to establish a supervisory duty over police pursuits on the part of Doyle. Even without a written ECSO policy, the actions of those involved in the pursuit suggest the existence of an established practice of Doyle providing oversight during pursuits. The evidence suggests that Doyle had a ministerial, not discretionary, duty to ensure Meredith and Jones were following the ECSO policies. At this time Doyle cannot, as a matter of law, invoke the protections of qualified immunity.

Furthermore, whether Doyle breached his duty is a question to be resolved for the jury.[9] While the ECSO pursuit policy outlines a plethora of information a pursuing officer is to consider in initiating and maintaining a pursuit, Doyle specifically knew that this pursuit involved speeds of over 100 miles an hour. (Doyle Dep. 18:9-15). Doyle admits that he did not know the original purpose of the stop, which is a factor that must be considered under the ECSO pursuit policies when initiating and continuing the pursuit. (Doyle Dep. 18:5-8; Pls.' Resp. Defs.' Mots. Summ. J. Ex. 1, at 3). The extent of Doyle's involvement was listening to a malfunctioning radio system relaying information about the pursuit, receiving a call from Meredith's passenger, and instructing

---

[9] Doyle does not dispute that he owed a general duty to Plaintiffs to exercise reasonable care under the circumstances. *See James v. Meow Media, Inc.*, 300 F.3d 683, 690 (6th Cir. 2002) ("Kentucky courts . . . [have] establish[ed] a 'universal duty of care.' Under the universal duty of care, 'every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury.'" (internal citations omitted) (citation omitted)).

Meredith's passenger to "keep [Doyle] informed" about the pursuit.  Doyle admits he did not attempt to communicate with Jones or Meredith, reasoning that he "didn't think [he] had anything to offer that they needed to hear from [him] at that time because they were trying to concentrate on apprehending that suspect."  (Doyle Dep. 18:16-21).  Doyle, however, had other sources of communication through dispatch or Meredith's passenger, without breaking Meredith and Jones' concentration during their 12-minute pursuit.  It will likely be for the jury to resolve whether Doyle exercised ordinary or any care when carrying out his ministerial duty of ensuring that Meredith and Jones followed the ECSO policies.

Doyle makes no other argument that summary judgment in his favor is appropriate on Plaintiffs' negligence and gross negligence claims.  For all of the aforementioned reasons, Doyle's request for qualified immunity and summary judgment on Plaintiffs' negligence and gross negligence claims will be denied.

### C.   Defendants' Motion to Exclude Plaintiffs' Expert Witness

Defendants move to exclude Plaintiffs' proffered expert witness, William Fryer ("Fryer"), from testifying at trial.  (Defs.' Mot. Exclude Expert Witness 1, DN 56).  Generally speaking, the substance of Fryer's proposed testimony is an evaluation of the propriety of the pursuit.  (Pls.' Expert Witness Disclosures Ex. 1, at 1-14, DN 48-1 [hereinafter "Fryer Report"]).

#### 1.   *Legal Standards*

Fed. R. Evid. 702 permits expert testimony relating to technical or specialized knowledge where it will assist the trier of fact to determine a fact in issue.  As a prerequisite, such testimony must meet the following criteria:

> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;
> (c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[N]o single factor is necessarily dispositive of the reliability of a particular expert's testimony."). Under this rule, the trial judge is the gatekeeper to ensure that expert testimony satisfies the requirements of reliability and relevance. *Mike's Train House Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). As the Sixth Circuit has further noted:

> Parsing the language of [Fed. R. Evid. 702], it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (internal citations omitted) (citation omitted). "Experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (second alteration in original) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). "Rule 702 directs courts to focus on the reliability of expert testimony, rather than the 'credibility and accuracy' of that testimony." *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *Scrap Metal*, 527 F.3d

at 529).  Although the U.S. Supreme Court in *Daubert* identified a non-exhaustive list of factors a trial court may consider in evaluating an expert's proposed testimony, "the four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir. 1997)).

"It is the proponent of the testimony that must establish its admissibility by a preponderance of proof."  *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).  That being said, "[a]ny doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility."  *In re E. I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015) (citations omitted). "[R]ejection of expert testimony is the exception, rather than the rule . . . ."  *Scrap Metal*, 527 F.3d at 530 (citation omitted).

### 2.     *Foundation of Fryer's Purported Testimony*

Fryer is a 25-year veteran of the Lexington Division of Police.  (Fryer Report 1).  Fryer earned several certifications there, including as an Emergency/Police Driving Academy Instructor. (Fryer Report 1).  During his 34 years as a certified driving instructor, Fryer has been responsible for training police officers in vehicle operation, including pursuit driving.  (Fryer Report 1; Fryer Dep. 23:14-18, 29:2-9, Jan. 7, 2020, DN 68-1).  Fryer is currently certified by the Kentucky Law Enforcement Council as an instructor in several areas, including Emergency Driving and Skills Vehicle Operations:  Motor Vehicles.  (Fryer Report 1; Pls.' Expert Witness Disclosures Ex. 4, at 4, DN 48-1 [hereinafter Fryer CV]).  Implicit in Fryer's deposition testimony and expert witness report is that he based his opinions on the standards that qualify him to be an instructor on police

pursuit driving.  (Fryer Dep. 71:22-72:9; Fryer Report 10).[10]  Plaintiffs have met their burden of evidencing that Fryer's background and his past and present certifications to instruct officers on pursuit driving provide a reliable foundation to his evaluation of the propriety of the pursuit at issue in this case.

Defendants argue that Fryer is not qualified to offer his opinions on the propriety of the pursuit at issue in this case for two reasons:  (1) Fryer's police pursuit policy knowledge is out of date; and (2) Fryer has limited practical experience with police pursuits.  (Defs.' Mem. Supp. Mot. Exclude Witness 3-5, DN 56-1; Defs.' Reply Mot. Exclude Witness 1-3, DN 79).  Both of these arguments are easily dispelled considering that Fryer is *currently* certified by the Kentucky Law Enforcement Council as an instructor for emergency driving skills.  (Fryer Report 1; Fryer Dep. 44:10-13 ("Emergency driving . . . includes pursuit driving."); Fryer Dep. 29:2-16 ("[P]ursuit driving . . . was one of the areas that I went back to . . . keep my certifications for . . . being an instructor . . . ."); Fryer CV 4).  It is incongruent for Defendants to argue that Fryer is not qualified to testify about the propriety of the police pursuit when he is currently certified by the Commonwealth to teach law enforcement personnel about pursuit driving.

Defendants do not explain how police pursuit driving policy has changed over the years to render Fryer's testimony out-of-date.  Neither have Defendants proffered any evidence suggesting that Fryer's knowledge and expertise on police pursuit policy is no longer compatible with so-called "modern" police pursuit policy.  Similarly, Defendants have not explained why Fryer's experience in the three pursuits with which he has been involved is insufficient experience through which to render an opinion about the propriety of a police pursuit.  Defendants essentially argue

---

[10] In these cited portions of the record, Fryer describes that he relied on "[s]tandards that [he's] been trained [on]" in forming his opinions and uses pursuit terminology that appears to be drawn from his knowledge as a certified police pursuit instructor.

31

that Fryer would need to be involved in a police pursuit that mirrors the circumstances of the pursuit at issue in this case.  As this Court has noted:

> The law does not require that an admissible expert have every conceivable qualification, only that his background provides a proper foundation for testimony which will 'assist the trier of fact in understanding and disposing of issues relevant to the case.' . . . The law does not require [an expert to] be the most qualified expert conceivable . . . ."

*Faughn v. Upright, Inc.*, No. 5:03-CV-000237-TBR, 2007 WL 854259, at *1, *3 (W.D. Ky. Mar. 15, 2007); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007) ("It is of little consequence to questions of admissibility that [an expert] lack[s] expertise in the very specialized area [the challenger defines] . . . ."  (citations omitted)).  "Whether [an expert's] expertise is dated or his [specific] experience . . . too limited go to the weight of his testimony, not its admissibility." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 596 F. Supp. 2d 1101, 1122 (M.D. Tenn. 2009).

Although Defendants challenge the basis for Fryer's opinions, they fail to acknowledge that Fryer is relying on the standards that currently qualify him to instruct law enforcement personnel on pursuit driving.  (Defs.' Mem. Supp. Mot. Exclude Expert Witness 9-10; Fryer Dep. 29:2-16, 34:10-12).  Defendants' challenge to the foundation of Fryer's opinions about the propriety of the pursuit at issue in this case is rejected.

### 3.     *Substance of Fryer's Opinions*

Defendants also take issue with the substance of Fryer's testimony in other ways.  First, Defendants take issue with Fryer's proposed testimony to the extent that he seeks to testify as to matters of law.  (Defs.' Mem. Supp. Mot. Exclude Witness 5-9; Defs.' Reply Mot. Exclude Witness 4-6).  Defendants, however, cite little specific proposed testimony they challenge.  A sister court has provided the appropriate guidance on this issue:

> [Movant] is correct in stating that expert testimony expressing legal conclusions is improper and should be excluded.  Here, [the expert] used common terms that can sometimes be construed as legal terms, depending on the context in which they are used.  However, the court finds that [the expert] did not use the challenged words in the context of improper legal conclusions.  Therefore, [Movant]'s motion as to this point is denied.

*Askew v. City of Memphis*, No. 14-cv-02080-STA-TMP, 2016 WL 4533584, at *7 (W.D. Tenn. Feb. 29, 2016) (internal citations omitted) (citation omitted).  At this point, Defendants have not established that Fryer's testimony at trial will stray out of the bounds.  The little proposed testimony Defendants point to consists of Fryer's use of the term "reasonableness"; however, this appears to be a colloquial reference to reasonableness rather than a legal one.  (Fryer Dep. 71:22-72:9).

Second, to the extent Defendants take issue with Fryer's testimony on the ultimate issue in this case, "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  In the context of a specific example:

> Although an expert's opinion may "embrace[] an ultimate issue to be decided by the trier of fact[,]' the issue embraced must be a factual one.  The expert can testify, if a proper foundation is laid, that the discipline in the [police department] was lax.  He also could testify regarding what he believed to be the consequences of lax discipline.  He may not testify, however, that the lax discipline policies of the [police department] indicated that the City was *deliberately indifferent* to the welfare of its citizens.

*Berry*, 25 F.3d at 1353 (citation omitted).  Again, Defendants have not shown that Fryer's proposed testimony will stray beyond the Sixth Circuit's instruction on an expert's testimony regarding the "ultimate issue."

Third, Defendants take issue with what they call "contradictions" in Fryer's proposed testimony.  (Defs.' Mem. Supp. Mot. Exclude Expert Witness 10-12; Defs.' Reply Mot. Exclude Witness 6-7).  This argument is easily dispensed with:  "Defendant's argument that [Expert's] testimony is self-contradictory . . . is not sufficient to warrant preclusion."  *Clark v. Travelers Cos.*,

No. 2:16-cv-02503-ADS-SIL, 2020 WL 473616, at *5 (E.D.N.Y. Jan. 29, 2020) (citing *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018); *In re Fosamax Prod. Liab. Litig.*, 924 F. Supp. 2d 477, 496 (S.D.N.Y. 2013)).

Finally, although Defendants assert that Fryer's testimony is contrary to the law, they have failed to identify any of Fryer's testimony that is actually contrary to the law.  (Defs.' Mem. Supp. Mot. Exclude Expert Witness 12-14; Defs.' Reply Mot. Exclude Witness 7-8).  For example, Defendants take issue with Fryer's position that Meredith should not have attempted to stop the car for an unilluminated license plate.  (Defs.' Mem. Supp. Mot. Exclude Expert Witness 12).  While Defendants insinuate that Fryer asserts that Meredith did not have the legal justification for initiating a stop, Fryer simply stated his personal belief that an officer should not initiate a stop for an unilluminated license plate.  (Fryer Dep. 79:16-80:9).  The rest of Defendants' criticisms of Fryer's testimony reflect similar misconstructions of that testimony.  There is no indication that Fryer's testimony at trial will "invade[] the province of the court to determine the applicable law and to instruct the jury as to that law."  *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (citations omitted).

At this point, Plaintiffs have met their burden of evidencing the admissibility of Fryer's testimony at trial, and Defendants have failed to provide a justification for preventing Fryer from testifying at trial.

## V.     __CONCLUSION__

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.      The parties' Motions for Leave to Exceed Page Limitations (DNs 54, 55, 65, 78) are **GRANTED**.

2.      Defendants' Motions for Summary Judgment (DNs 57, 58, 59) are **GRANTED IN PART** and **DENIED IN PART**.  All claims against Defendant Austin Meredith are **DISMISSED WITH PREJUDICE**.  All claims against Defendant Edmonson County are **DISMISSED WITH PREJUDICE**.  All Fourth and Fourteenth Amendment claims stemming from M.S. and C.S.'s injuries suffered as a result of the collision are **DISMISSED WITH PREJUDICE**.  Plaintiffs' assault claims are **DISMISSED WITH PREJUDICE**.  All other claims survive.

3.      Defendants' Motion to Exclude Plaintiffs' Expert Witness (DN 56) is **DENIED**.

Greg N. Stivers, Chief Judge

United States District Court

August 13, 2020

cc:     counsel of record

35